104 F.3d 950
 Marc FORMAN, William Dix, Jr., and Guy Vanderpool,
Plaintiffs-Appellants,
v.
RICHMOND POLICE DEPARTMENT and Mark Smith, Lieutenant,
Individually and as officer with the Richmond
Police Department, Defendants-Appellees.
 No. 96-2091.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 23, 1996.
Decided Jan. 15, 1997.
 
 Thomas D. Margolis (argued), Muncie, IN, for Plaintiffs-Appellants.
 G. Ronald Heath, Mark A. Palmer (argued), Johnson, Smith, Pence, Densborn, Wright & Heath, Indianapolis, IN, for Defendants-Appellees.
 Before WOOD, Jr., RIPPLE, and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 This case arises from a police raid of an unlicensed bingo operation in Richmond, Indiana. After determining that the bingo game was being conducted in violation of Indiana law, Lt. Mark Smith of the Richmond Police Department obtained written consent to search the Richmond Plaza Bingo Center ("Bingo Center") from the operator of the bingo game, who was also the leaseholder of the premises. While conducting their warrantless, yet consensual search, Richmond police officers entered a locked room on the premises by removing its door from the hinges. Inside that room, the officers discovered ten video gambling machines that were allegedly being operated in an illegal manner. Marc Forman admitted that he was the lessee of that room and the owner of the gambling machines.
 
 
 2
 As a result of this search and further investigation of the bingo operation and the gambling machines, the police eventually arrested Marc Forman, William Dix, Jr., and Guy Vanderpool, charging them with various counts of professional gambling. The State, however, dropped its charges against Forman after an Indiana state trial court granted Forman's motion to suppress the evidence-- i.e., the gambling machines and related materials--recovered during the search of the locked room at the Bingo Center. The State also dropped the charges against Vanderpool. Dix's case, however, proceeded to trial where he was convicted on professional gambling and theft charges.
 
 
 3
 Forman, Dix, and Vanderpool subsequently filed a complaint in the United States District Court for the Southern District of Indiana alleging that Lt. Smith, the Richmond Police Department, and others violated a number of their federal and state constitutional rights, as well as various state laws. This appeal is primarily concerned with their 42 U.S.C. § 1983 claims contending that Lt. Smith and the Police Department violated their Fourth and Fourteenth Amendment rights while conducting their warrantless search of the Bingo Center and in effectuating their subsequent arrests. Because we find Appellants' claims to be without merit, we affirm the decision of the district court granting summary judgment in favor of Appellees.
 
 I. HISTORY
 
 4
 On April 3, 1992, Lt. Mark Smith--an investigator with the Special Investigations Unit and a seventeen-year veteran of the Richmond Police Department--received information that the Bingo Center had been operating without a valid bingo permit. Max Pratt, the President of the Muncie Fraternal Order of Police ("FOP"), told Lt. Smith that the Bingo Center had been using the FOP's charity bingo permit without the FOP's authorization. Pratt also informed Lt. Smith that earlier in the day he had removed a copy of that permit from the Bingo Center, that the Bingo Center continued to conduct its bingo operation, and that he was unaware of another bingo license on the premises.
 
 
 5
 Lt. Smith went to the Bingo Center that night in order to determine the validity of Pratt's claim. When Lt. Smith arrived at the Bingo Center, he observed Guy Vanderpool shut an open door at the rear of the parlor. Lt. Smith then spoke with Vanderpool who introduced Lt. Smith to Luther Ogletree, the person in charge of the Bingo Center. Ogletree told Lt. Smith that he was the operator of the bingo game and the lessor of the premises. The two men then went into an office in the rear of the building to discuss the Bingo Center's operating permit. Upon entering the office, Lt. Smith saw William Dix, Jr. and Bertha Ogletree counting money from that night's bingo operations.
 
 
 6
 After searching the office with Dix and Bertha Ogletree, Luther Ogletree was unable to produce a valid bingo permit. Lt. Smith subsequently informed Ogletree that the Bingo Center was operating illegally and that he would have to stop the game. Lt. Smith called for additional police officers to help him shut down the operation.
 
 
 7
 Lt. Smith also called the Wayne County Prosecutor, Terry O'Maley, to discuss whether the police needed a warrant to search the premises. O'Maley told Lt. Smith that they would not need a search warrant if they obtained valid consent to search the building.
 
 
 8
 Next, Lt. Smith obtained a standard Richmond Police Department Consent to Search form and read its contents to Ogletree. Ogletree stated that he understood the form, and then he signed it. Lt. Smith and other officers began searching the office and other areas of the building. In the office, the police found several thousand dollars in cash, the Bingo Center's operating records, and a handgun. When searching the rest of the building, the police encountered a locked room at the rear of the Bingo Center. Lt. Smith had seen Vanderpool close the door to this room when he first arrived at the bingo parlor that evening. The police did not ask Ogletree, Vanderpool, or anyone else if they had a key for the room; instead, they removed the door from its hinges. Ogletree was present when the police removed the door, but he did not ask the police to stop their search, nor did he otherwise attempt to withdraw or qualify his written consent to search.
 
 
 9
 Inside that room, police officers discovered ten video gambling machines and ten stools. The room did not contain any bingo supplies. Ogletree told Lt. Smith that the machines belonged to Marc Forman and provided a copy of his lease agreement with Forman. Vanderpool then informed Lt. Smith that he worked as a volunteer at the Bingo Center under Ogletree's supervision, and he gave Lt. Smith keys to both the room and the machines.
 
 
 10
 At that time, Lt. Smith once again contacted O'Maley to determine what steps to take in regard to the video gambling machines. Pursuant to O'Maley's advice, Lt. Smith confiscated the currency, the gambling machines, and the bingo operation records. No individuals were arrested that night at the Bingo Center. Later that night, Forman called Lt. Smith and claimed ownership of the gambling machines.
 
 
 11
 Three days later, Ogletree provided Lt. Smith with a bingo permit issued to the New Hope Missionary Baptist Church ("New Hope Church") of Dayton, Ohio. The next day, Richmond police officers went to the address in Dayton, Ohio but found no church there. Lt. Smith further investigated the New Hope Church permit by contacting the Indiana Secretary of State's Office. That office informed Lt. Smith that it never issued a valid charity gaming permit to the New Hope Church. Lt. Smith subsequently presented these findings, via an affidavit, to the Wayne County Superior Court and obtained a warrant to search the Bingo Center. Several Richmond police officers executed this warrant on April 8, 1992.
 
 
 12
 On April 8, 1992, Richmond police officers arrested Dix (as well as Bertha and Luther Ogletree) on charges of professional gambling. Those charges were based on Dix's activities at the Bingo Center during the first, warrantless search of the premises on April 3, 1992. O'Maley prepared, and Lt. Smith signed an Affidavit of Probable Cause against Dix on June 30, 1992. This Affidavit and an Information charging Dix with committing Professional Gambling and Theft--two class D felonies--were filed on September 22, 1992. The State filed no charges against Dix arising out of the April 8, 1992 search of the Bingo Center. The Wayne County Superior Court denied Dix's subsequent motions to dismiss the charges and to suppress the evidence taken during the April 3, 1992 search. Ultimately, a jury convicted Dix of both charges, and the Indiana Court of Appeals affirmed Dix's conviction.
 
 
 13
 On June 29, 1992, approximately two and a half months after the seizure of the video gambling machines, Lt. Smith signed an Affidavit of Probable Cause regarding Forman based on Forman's admitted knowledge and ownership of the machines. The Affidavit alleged that the police had probable cause to believe that Forman committed two counts of Professional Gambling on April 3, 1992.
 
 
 14
 The Richmond Police Department, however, took no further action against Forman until April 20, 1993. On that day, police officers made a warrantless arrest of Forman in the hallway of the Wayne County Courthouse. The previously executed Affidavit of Probable Cause and an Information charging Forman with two counts of professional gambling were filed with the Wayne County Circuit Court on April 30, 1993.
 
 
 15
 On May 4, 1993, Forman filed a motion to suppress the evidence seized from the locked room at the Bingo Center. The court granted Forman's motion noting that the officers should have asked the consenting party to unlock the door to the room before removing it from its hinges. The Wayne County Prosecutor's office subsequently dismissed the charges against Forman stating "the Court's ruling on the Defendant's Motion to Suppress precludes further prosecution." On April 12, 1995, an Indiana appellate court reversed the trial court's ruling on the Motion to Suppress. See State v. Foreman, 649 N.E.2d 120 (Ind.Ct.App.1995). That court held, as a matter of law, that the Richmond Police Department reasonably believed that Ogletree possessed common authority over the room leased to Forman, and as such, Ogletree's consent to search extended to that room. Id. at 125. The Supreme Court of Indiana, however, reversed the court of appeals and ruled that regardless of whether Ogletree had common authority over the locked room, there was sufficient evidence that Ogletree did not consent to the search of that room. State v. Foreman, 662 N.E.2d 929, 932 (Ind.1996). In support of this position, the court reasoned that if the police reasonably believed that Ogletree consented to the search of the room they would have simply asked him to unlock the door rather than removing it from its hinges. Id.
 
 
 16
 On June 29, 1992, Lt. Smith also executed an Affidavit of Probable Cause relating to Vanderpool maintaining that he had probable cause to believe that Vanderpool committed two counts of Professional Gambling. The Affidavit was based on Lt. Smith's observations on April 3, 1992 and further police investigation, which revealed that Vanderpool helped Forman bring the video gambling machines into the building, he supervised customer use of the machines, and he provided the customers with their winnings or "payout" from the machines. On April 30, 1993, O'Maley filed this Affidavit and an Information against Vanderpool. Ten days later, the Wayne County Superior Court issued an arrest warrant for Vanderpool; Lt. Smith arrested Vanderpool on June 2, 1993. On May 9, 1994, however, O'Maley filed a motion to dismiss the charges against Vanderpool stating that the case did not merit further prosecution.
 
 
 17
 In their Amended Complaint, Forman, Dix, and Vanderpool contended that Lt. Smith, the Richmond Police Department, and others violated 42 U.S.C. §§ 1983 and 1985 by depriving them of their rights under the United States Constitution, the Indiana Constitution, and various statutory provisions. All three plaintiffs also brought false arrest and false imprisonment claims, and Dix added a claim for defamation.
 
 
 18
 The parties filed cross motions for summary judgment in January and February of 1995. The district court granted Lt. Smith's and the Richmond Police Department's motion and denied plaintiffs' motion. With regard to the claims against Lt. Smith, the court held that Lt. Smith either did not violate the plaintiffs' constitutional rights or that he was entitled to qualified immunity for any constitutional or state law violations that did occur. Next, the court found that plaintiffs failed to establish that the Richmond Police Department violated their constitutional rights through some official policy or custom. Finally, the court ruled in favor of the unnamed police officers ("John Does 1-50") because plaintiffs failed to identify them within the applicable two-year statute of limitations. The court also noted that these defendants would be entitled to the same qualified immunity as Lt. Smith. Forman, Dix, and Vanderpool subsequently brought this appeal.
 
 II. ANALYSIS
 
 19
 The only issues Forman, Dix, and Vanderpool properly preserved for appeal are whether Lt. Smith, the Richmond Police Department, or any other officers from the department violated 42 U.S.C. § 1983 by depriving them of their constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.[1]
 
 A. Standard of Review
 
 20
 We utilize a de novo standard of review in analyzing a district court's grant of summary judgment, Campbell v. Towse, 99 F.3d 820, 826 (7th Cir.1996), and its determination of a law enforcement officer's entitlement to qualified immunity, Jones by Jones v. Webb, 45 F.3d 178, 183 (7th Cir.1995).
 
 
 21
 Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the party opposing the motion and draw all justifiable inferences in favor of that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986). However, neither "the mere existence of some alleged factual dispute between the parties," Anderson, 477 U.S. at 247, 106 S.Ct. at 2510, nor the demonstration of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), will sufficiently demonstrate a genuine issue of material fact. In that regard, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.
 
 
 22
 B. Forman's, Dix's, and Vanderpool's Sec. 1983 Claims Against Lt. Smith
 
 
 23
 The resolution of the § 1983 claims against Lt. Smith primarily depends upon whether Lt. Smith was entitled to qualified immunity for his actions in the investigation of the alleged illegal activities at the Bingo Center, and the subsequent arrest of those allegedly involved in these activities. Qualified immunity is generally a question of law for the court to resolve, Rakovich v. Wade, 850 F.2d 1180, 1201-02 (7th Cir.1988), "at the earliest possible stage in litigation," Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991). As such, summary judgment provides a proper posture from which to decide this objective legal question, which we review de novo. Rakovich, 850 F.2d at 1204-05.
 
 
 24
 Government officials may raise qualified immunity as an affirmative defense to actions brought against them under 42 U.S.C. § 1983. Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 1924, 64 L.Ed.2d 572 (1980). In Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818, 102 S.Ct. at 2738. Harlow thus announced an objective standard for determining whether a government officer is entitled to qualified immunity. Id. at 816-19, 102 S.Ct. at 2737-39. In that regard, a "law enforcement officer who participates in a search that violates the Fourth Amendment may [not] be held personally liable for money damages if a reasonable officer could have believed that the search comported with the Fourth Amendment." Anderson v. Creighton, 483 U.S. 635, 636-37, 107 S.Ct. 3034, 3037, 97 L.Ed.2d 523 (1987).
 
 
 25
 In this circuit, we have outlined a two-step approach for analyzing a defendant's qualified immunity defense: "(1) Does the alleged conduct set out a constitutional violation? and (2) Were the constitutional standards clearly established at the time in question?" Kernats v. O'Sullivan, 35 F.3d 1171, 1176 (7th Cir.1994) (citing Siegert v. Gilley, 500 U.S. 226, 231-32, 111 S.Ct. 1789, 1792-93, 114 L.Ed.2d 277 (1991)); see also Siegert, 500 U.S. at 232, 111 S.Ct. at 1793 ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all."). A negative answer to either prong of this test will decide the matter. Montville v. Lewis, 87 F.3d 900, 902 (7th Cir.1996).
 
 
 26
 Once a defendant has raised a qualified immunity defense, the plaintiff bears the burden of demonstrating the violation of a clearly established right. Kernats, 35 F.3d at 1176 (citing Rakovich, 850 F.2d at 1209). To demonstrate that a right is "clearly established," plaintiffs need not show that "the very action in question" was previously held unlawful, Anderson, 483 U.S. at 640, 107 S.Ct. at 3039, or that a prior case is "on all fours" with the facts and the law in their own case, Landstrom v. Illinois Dep't of Children & Family Servs., 892 F.2d 670, 676 (7th Cir.1990). Instead, "[c]losely analogous cases, those decided before the defendants acted or failed to act, are required to find that a constitutional right is clearly established." Rakovich, 850 F.2d at 1209 (quoting Powers v. Lightner, 820 F.2d 818, 821 (7th Cir.1987)).
 
 
 27
 A key determination in this analysis is the level of generality for courts to apply in identifying which legal rights are clearly established. See Kerr v. Farrey, 95 F.3d 472, 480 (7th Cir.1996). "[T]he Supreme Court cautioned against imposing an unrealistic burden on public officials" in conducting this analysis. Id. (citing Anderson, 483 U.S. at 639, 107 S.Ct. at 3038-39). Requiring too much hesitation from our public officials would impair the purpose of qualified immunity, which is to give " 'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " Hunter, 502 U.S. at 229, 112 S.Ct. at 537 (quoting Malley v. Briggs, 475 U.S. 335, 343, 341, 106 S.Ct. 1092, 1097, 1096, 89 L.Ed.2d 271 (1986)). An "accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." Id. (quoting Davis v. Scherer, 468 U.S. 183, 196, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984)). As such, a "clearly established" right must be sufficiently clear so that a reasonable officer would understand that he is violating that right. Anderson, 483 U.S. at 640, 107 S.Ct. at 3039.
 
 
 28
 1. Forman's Claims.
 
 
 29
 Forman raises two § 1983 claims against Lt. Smith. First, he alleges that Smith violated his Fourth Amendment right against unreasonable searches and seizures by conducting a warrantless search of the locked room in the Bingo Center and seizing the ten gambling machines found inside. Second, Forman claims that Smith violated his constitutional rights by either ordering or participating in his warrantless arrest on April 20, 1993.
 
 
 30
 In regard to Forman's unreasonable search and seizure claim, it makes sense to initially analyze the second prong of the qualified immunity test-- i.e., whether there were clearly established constitutional standards governing the warrantless search of the locked room--in order to avoid addressing the more difficult question of whether the warrantless search was in fact unconstitutional. See Montville, 87 F.3d at 902 ("At times it makes sense to address the second prong at the outset.") Thus, we must determine whether Lt. Smith could have reasonably believed that the search of the locked room was lawful in light of the factual scenario and the clearly established law on April 3, 1992.
 
 
 31
 An examination of the precedent available in April 1992 regarding the scope of consent searches reveals that the constitutional standards governing the consensual search in this case were not clearly established. Specifically, it was not clear from the established Fourth Amendment precedent that Lt. Smith was required to ask the consent giver (Ogletree) for a key to unlock the room containing the video gambling machines.
 
 
 32
 By April 1992, it was plainly clear that the Fourth Amendment's general prohibition against the warrantless search of a person's property did not apply when the "search [is] conducted pursuant to a valid consent." Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). A third party with common authority over the premises sought to be searched may provide such valid consent. United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). Moreover, a warrantless search was "valid when based upon the consent of a third party whom the police, at the time of the entry, reasonably believe to possess common authority over the premises" even if that third party did not possess such authority. Illinois v. Rodriguez, 497 U.S. 177, 179, 110 S.Ct. 2793, 2796, 111 L.Ed.2d 148 (1990); see also Myers v. State, 564 N.E.2d 287, 290 (Ind.Ct.App.1990) (finding it "eminently reasonable" for an officer to search defendant's "company car" based upon the consent given by defendant's employer--who was the registered owner of the vehicle--because the officer was unaware that defendant had exclusive possession and control of the car).
 
 
 33
 The Supreme Court had also addressed situations involving the scope of warrantless searches. In United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), for example, the Court held that a "lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." Id. at 820-21, 102 S.Ct. at 2170-71 The Court maintained that when "a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers ... must give way to the interest in the prompt and efficient completion of the task at hand." Id. at 821, 102 S.Ct. at 2171; see also Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803-04, 114 L.Ed.2d 297 (1991) (finding no Fourth Amendment violation where defendant consented to the search of his car and the police found cocaine in a closed paper bag found on the floor of the car). In Jimeno, however, the Court added in dicta that it was "very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the breaking open of a locked briefcase within the trunk." Jimeno, 500 U.S. at 251-52, 111 S.Ct. at 1804.
 
 
 34
 Before April 3, 1992, this court and the Indiana courts had similarly considered cases involving the scope of consent searches, often finding that the consent to search a room or a container permitted officers to search other rooms or containers within the permitted areas. See, e.g., United States v. Lechuga, 925 F.2d 1035, 1042-43 (7th Cir.1991) (finding that a defendant's consent to search an apartment extended to the search of a suitcase within a closet in the apartment); United States v. Dyer, 784 F.2d 812, 816 (7th Cir.1986) (finding that defendant's consent to search a piece of luggage extended to a sealed box within the luggage); Heald v. State, 492 N.E.2d 671, 680 (Ind.1986) (finding that a person's consent to search a handbag operated as a consent to search items, such as a letter inside an unsealed envelope, found within the handbag); but cf. United States v. Garcia, 897 F.2d 1413, 1419-20 (7th Cir.1990) (noting that the "opening of [a car's] door panels is not normally included in [the] set of areas to be searched" and "inherently invasive," but ultimately holding that the dismantling of the doors was justified by probable cause); United States v. Rodriguez, 888 F.2d 519, 523-25 (7th Cir.1989) (finding that defendant's wife's consent to search a room did not necessarily include consent to search closed containers within that room unless the wife had apparent authority to consent to the opening of those closed containers).
 
 
 35
 The most analogous set of facts we could find involved a Fifth Circuit case in which police officers, after obtaining oral consent to search a house, used a sledgehammer to knock out boards covering the entrance to the house's attic. This opening was in the ceiling of a bedroom closet, and it provided the only means of access to the attic. In its original decision, a split Fifth Circuit panel found the police action to be reasonable. United States v. Ibarra, 948 F.2d 903, 907 (5th Cir.1991) (Ibarra I ). Relying upon the Supreme Court's decisions in Rodriguez, Jimeno, and Ross, the panel's majority found that the defendant "having consented to a limitless search of the house, relinquished his expectation of privacy in the attic, and because other means of access were unavailable," the police conduct was reasonable. Id. Upon rehearing en banc, however, the Fifth Circuit was equally divided (7-7) on whether the police violated the defendant's Fourth Amendment rights, and thus the court affirmed the district court's order suppressing the evidence. United States v. Ibarra, 965 F.2d 1354, 1354 (5th Cir.1992) (Ibarra II ).
 
 
 36
 Based on these precedents it was not at all clear in April 1992 that Lt. Smith was required to ask for a key to the locked room within the Bingo Center after Ogletree had already provided his written consent to search the entire building. Neither party has presented us with a case setting forth a rule stating that a consent to search either does or does not encompass locked rooms on the premises consented to be searched. If anything, the caselaw detailed above (especially the Fifth Circuit's original Ibarra I decision, which was decided in November 1991--less than one year before the search here) demonstrates that in April 1992, Lt. Smith may not have needed to seek further consent to search the locked room in the Bingo Center.
 
 
 37
 Perhaps the best indication that the standards governing this consent search were not clearly established is the fact that two Indiana appellate courts could not agree on whether it was objectively reasonable for Lt. Smith to believe that Ogletree had consented to the search of the locked room. Compare Foreman, 649 N.E.2d at 125 (ruling that it was objectively reasonable, as a matter of law, for the police to determine that Ogletree possessed common authority over the premises and thereby consented to the search of the locked room) with Foreman, 662 N.E.2d at 932 (finding that the consent to search did not extend to the locked room regardless of whether Ogletree possessed common authority over that room). The Fifth Circuit's split decision in Ibarra I, as well as its inability to reach a majority in Ibarra II, similarly suggest that there was no "clearly established" precedent for Lt. Smith to follow regarding the search of the locked room in the Bingo Center.[2]
 
 
 38
 Moreover, the specific facts confronted by Lt. Smith bear out the reasonableness of his actions in light of the law. Upon entering the Bingo Center, Lt. Smith noticed Vanderpool closing the door to the locked room. Vanderpool then directed Lt. Smith to Ogletree who identified himself as the operator of the Bingo Center and the leaseholder of the premises. Ogletree did not inform Lt. Smith that Forman was the lessee of the locked room until after the police discovered the gaming machines. Based on this information alone, it was objectively reasonable for Lt. Smith to believe that Ogletree possessed at least common authority, if not sole authority, over the entire Bingo Center.
 
 
 39
 Lt. Smith's decision to seek the advice of O'Maley, the county prosecutor, similarly supports his defense. After determining that the bingo game was being operated without a valid permit, Lt. Smith sought O'Maley's advice regarding the procedures he should take in closing down the game and searching the premises. O'Maley instructed Lt. Smith to obtain a consent to search the premises. Lt. Smith followed this advice and he obtained Ogletree's written and oral consent to search the building. While Lt. Smith's reliance on O'Maley's advice to seek the consent to search, as opposed to obtaining a search warrant, does not alone satisfy Lt. Smith's burden of acting reasonably, it does provide evidence of his good faith and objective reasonableness. See Lucero v. Hart, 915 F.2d 1367, 1371 (9th Cir.1990); Tubbesing v. Arnold, 742 F.2d 401, 407 (8th Cir.1984).
 
 
 40
 Finally, throughout the police officers' search of the Bingo Center, Ogletree never attempted to limit or qualify his consent to search in any way. "[W]here a suspect does not withdraw his valid consent to a search for illegal substances before they are discovered, the consent remains valid and the substances are admissible as evidence." Dyer, 784 F.2d at 816; accord United States v. Berke, 930 F.2d 1219, 1223 (7th Cir.1991). Had Ogletree wanted to prevent the police from searching the locked room, he could have easily presented the Forman lease and stated that only Forman could consent to the search of that room. Instead, Ogletree silently observed the police remove the door from its hinges. Ogletree disclaimed control of the room only after the gambling machines were discovered.
 
 
 41
 Although we find that Lt. Smith is entitled to qualified immunity, we do not dismiss the Indiana Supreme Court's concern about police officers removing a door from its hinges when they could have easily asked someone to unlock the door. Nonetheless, there was no clearly established precedent holding that the failure to seek a key for a locked room found on premises that could otherwise be lawfully searched would result in a violation of anyone's Fourth Amendment rights. As such, we find that the district court correctly determined that Lt. Smith was entitled to qualified immunity.[3]
 
 
 42
 We also reject Forman's claim that Lt. Smith violated his constitutional rights by ordering or participating in his warrantless arrest. Both sides dispute whether Lt. Smith had any involvement in Forman's warrantless arrest. If Lt. Smith did not participate in the alleged constitutional deprivation, he obviously cannot be held liable under § 1983. See Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir.1995); Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir.1983). We need not discuss whether there was a genuine issue of material fact as to Lt. Smith's participation in the arrest, however, because we find that Lt. Smith was entitled to qualified immunity for any action he may have conducted in relation to the arrest.
 
 
 43
 Lt. Smith is entitled to qualified immunity if he "could have believed [Forman's arrest] to be lawful, in light of clearly established law and the information [he] possessed." Hunter, 502 U.S. at 227, 112 S.Ct. at 536 (quoting Anderson, 483 U.S. at 641, 107 S.Ct. at 3040); Edwards v. Cabrera, 58 F.3d 290, 292 (7th Cir.1995). We must therefore decide whether it was objectively reasonable for Lt. Smith to believe that there was probable cause to arrest Forman, in light of the information available to him at the time of Forman's arrest. Hunter, 502 U.S. at 227-28, 112 S.Ct. at 536-37; Edwards, 58 F.3d at 292-93.
 
 
 44
 Indiana Code § 35-33-1-1 provides that a law enforcement officer may arrest someone when the officer has "probable cause to believe the person has committed or attempted to commit, or is committing or attempting to commit, a felony." An officer has probable cause to make a warrantless arrest when "the facts and circumstances known to the officer would warrant a [person] of reasonable caution to believe that the accused has committed the criminal act in question." Roberts v. State, 599 N.E.2d 595, 598 (Ind.1992); see also Hunter, 502 U.S. at 228, 112 S.Ct. at 537 ("Probable cause existed if 'at the moment the arrest was made ... the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' " that the accused committed the crime.) (quoting Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)).
 
 
 45
 At the time of Forman's arrest on April 20, 1993, Lt. Smith had probable cause to believe that Forman had committed a crime. The Affidavit of Probable Cause regarding Forman, sworn by Lt. Smith on June 29, 1992, details Lt. Smith's knowledge of the evidence against Forman: Lt. Smith observed the video gambling machines in the Bingo Center on April 3, 1992; he examined those "slot" machines in order to determine how they operated; and he subsequently received information that Forman was the owner of the machines, that Forman brought the machines to the Bingo Center, that Forman was the lessee of the room containing the machines, and that Vanderpool made payouts from the machines to customers. Lt. Smith was also aware that on April 6, 1993, Forman confirmed "that those machines were his and that he placed them there in the Richmond Plaza Bingo Center for profit." The Wayne County Prosecutor's office subsequently filed this Affidavit with the Wayne County Circuit Court, and that same court found that there was probable cause to arrest Forman on two counts of professional gambling.
 
 
 46
 The fact that the prosecutor (O'Maley) later determined that there was insufficient probable cause for Forman's arrest, and thus dropped the charges against Forman, does not affect Lt. Smith's entitlement to qualified immunity. The relevant inquiry is whether Smith acted objectively reasonable in light of the facts and law known to him at the time of Forman's arrest--not upon subsequent legal analysis.
 
 
 47
 We similarly reject Forman's assertion that the delay between the April 3, 1992 search of the Bingo Center and his April 20, 1993 arrest somehow violated his constitutional rights. There is no requirement that police officers must arrest an offender as soon as probable cause for the arrest exists. United States v. Reis, 906 F.2d 284, 289 (7th Cir.1990) (citing Hoffa v. United States, 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966)). Although it may have been better practice by the Richmond Police Department to obtain an arrest warrant, the preexisting probable cause to arrest Forman was not diminished by the mere passage of time. See Andrews v. State, 588 N.E.2d 1298, 1303 (Ind.Ct.App.1992); see also Plowman v. State, 604 N.E.2d 1219, 1221 (Ind.Ct.App.1992) (finding no constitutional violation for the thirty-month delay between defendant's alleged criminal conduct and his arrest because the defendant failed to demonstrate that undue prejudice resulted from the delay).
 
 
 48
 2. Dix's Claims.
 
 
 49
 In his cryptic brief, Dix apparently claims that his Fourth and Fourteenth Amendment rights were violated because 1) Lt. Smith conducted an investigation that did not adequately demonstrate the probable cause needed for the April 8, 1992 search warrant of the Bingo Center, and 2) Dix's subsequent arrest was incidental to this alleged "constitutionally infirm" search.[4]
 
 
 50
 The crux of Dix's first claim seems to be that Lt. Smith and the police department did not conduct a thorough enough investigation of the New Hope Church for there to be probable cause for a search warrant of the Bingo Center on April 8, 1992. Specifically, Dix asserts that Lt. Smith and the police should have checked the church's status with the Internal Revenue Service and the Ohio Secretary of State's office.
 
 
 51
 Dix, however, conveniently ignores our consistent holding that "once police officers have discovered sufficient facts to establish probable cause, they have no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence." Eversole v. Steele, 59 F.3d 710, 718 (7th Cir.1995); Garcia v. City of Chicago, 24 F.3d 966, 970 (7th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1313, 131 L.Ed.2d 194 (1995); Schertz v. Waupaca County, 875 F.2d 578, 583 (7th Cir.1989). Based on the information Lt. Smith uncovered from April 3 through April 8, he concluded that the New Hope Church had not met Indiana's requirements for a bingo permit. Lt. Smith determined that the Bingo Center was operating without a valid permit, and therefore, the game was being conducted in violation of Indiana law. Because Lt. Smith reasonably believed that the game violated Indiana law, he had sufficient probable cause to support the April 8, 1992 search warrant.
 
 
 52
 There is similarly no merit in Dix's claim that his warrantless arrest was unconstitutional. Because Lt. Smith had probable cause to support the April 8, 1992 search warrant, there can be no merit to Dix's "fruit of the poisonous tree"-type of claim that his arrest, which was incidental to the search, was unconstitutional.
 
 
 53
 Moreover, Lt. Smith had probable cause to arrest Dix based on his investigation of the bingo licenses and his observations of Dix on both April 3 and April 8. As explained above, probable cause for a warrantless arrest exists when "the facts and circumstances known to the officer would warrant a man of reasonable caution to believe that the accused has committed the criminal act in question." Roberts, 599 N.E.2d at 598; see Hunter, 502 U.S. at 228, 112 S.Ct. at 537. On April 3, 1992, the bingo game was being operated without a proper charity bingo permit, and thus in violation of Indiana law. Dix was one of the people in the Bingo Center office counting the proceeds and making records of that night's bingo game. Based on this information, Lt. Smith could conclude that Dix, as a bingo game worker, violated Indiana law on April 3, 1992.
 
 
 54
 A problem arises, however, because Dix was arrested on April 8, 1992. On that night, Lt. Smith again believed that the Bingo Center was operating without a valid permit and thus in violation of Indiana law. While executing the search warrant at the Bingo Center on April 8, 1992, Lt. Smith again saw Dix at the Bingo Center. Based upon his earlier observations of Dix on April 3, 1992, Lt. Smith could reasonably conclude that Dix was engaged in similar illegal activities that night. As such, it was objectively reasonable for Lt. Smith to believe that he had probable cause to arrest Dix based on Dix's April 3, 1992 actions, or incidental to the April 8, 1992 search.
 
 
 55
 Finally, even if there was a genuine issue of material fact regarding whether Lt. Smith had probable cause to arrest Dix, Lt. Smith was clearly entitled to qualified immunity. Lt. Smith's actions were reasonably based upon the facts and law available to him at the time--on both nights, he reasonably believed that the bingo game was operating without a valid permit and on at least one occasion, he saw Dix actively participating in the operation of the game. As such, we find Dix's claims to be without merit.
 
 
 56
 3. Vanderpool's Claims.
 
 
 57
 Unlike the arrests of Forman and Dix, Vanderpool was arrested pursuant to a warrant, which the Wayne County Superior Court issued on May 10, 1993. In his § 1983 claim against Lt. Smith, Vanderpool asserts that his June 3, 1993 arrest was in violation of his constitutional rights because there was no probable cause for the arrest warrant or the execution of that warrant. Vanderpool appears to present two arguments in support of his insufficient probable cause claims: 1) that Lt. Smith knew or should have known that the April 3, 1992 search of the Bingo Center was unreasonable, and 2) that Lt. Smith committed fraud upon the trial court in obtaining Vanderpool's arrest warrant.
 
 
 58
 In regard to the April 3, 1992 search, we have already determined that Lt. Smith was entitled to qualified immunity because his actions in searching the locked room and seizing the video gambling machines were objectively reasonable in light of the facts and law then available to him. Lt. Smith, therefore, did not know, nor could he have known that the April 3, 1993 search was unreasonable.
 
 
 59
 In his second argument, Vanderpool challenges the veracity of Lt. Smith's affidavit petitioning for an arrest warrant from the Wayne County Superior Court. In making this argument, Vanderpool bears the high burden of demonstrating that we should not attribute "great deference" to the magistrate's decision that a warrant should issue. United States v. Leon, 468 U.S. 897, 914, 104 S.Ct. 3405, 3416, 82 L.Ed.2d 677 (1984). In Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court put forth the standard for voiding a search warrant due to intentionally or recklessly provided information:
 
 
 60
 [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided....
 
 
 61
 Id. at 155-56, 98 S.Ct. at 2676; see United States v. Causey, 9 F.3d 1341, 1343 (7th Cir.1993). Thus, we will defer to the trial judge's probable cause determination unless Vanderpool demonstrates that Lt. Smith's affidavit was knowingly or intentionally false, or that Smith drafted the affidavit with a reckless disregard for the truth.
 
 
 62
 Vanderpool has failed to present one shred of evidence that Lt. Smith knowingly or intentionally included a false statement in the affidavit, or that he included material in the affidavit with reckless disregard for the truth. Vanderpool raised two examples to support his "fraud upon the court" claim: 1) that Lt. Smith could not recall the suppression hearing, and 2) that Lt. Smith was unable "to testify consistently on material points of fact and law." The alleged inconsistency in testimony (which we derived from the district court's opinion and Lt. Smith's brief because the argument section of Vanderpool's brief contained no reference to any specific inconsistencies) was that the various Affidavits of Probable Cause signed and sworn by Lt. Smith differed on whether the bingo permit that FOP President Pratt removed from the Bingo Center was an original or a photocopy.
 
 
 63
 Neither Lt. Smith's alleged faulty memory nor any misstatement that Lt. Smith may have made regarding the reprographic quality of the FOP permit was material. Immaterial misstatements will not invalidate an otherwise legitimate warrant. United States v. Oakley, 944 F.2d 384, 387 (7th Cir.1991); see Causey, 9 F.3d at 1343; United States v. Markling, 7 F.3d 1309, 1316 (7th Cir.1993). Moreover, an affidavit procured in part by tainted evidence is not necessarily invalid because the untainted information, considered by itself, may establish probable cause for the warrant to issue. Markling, 7 F.3d at 1316; Oakley, 944 F.2d at 387-88; see Franks, 438 U.S. at 155-56, 98 S.Ct. at 2676. In that regard, Vanderpool has presented no evidence or arguments that the Wayne County Superior Court would have refused to issue the arrest warrant if Lt. Smith's Affidavit lacked the information that Vanderpool now contends was inconsistent. Because there is no genuine issue of material fact regarding whether Lt. Smith knowingly or recklessly provided false information on the affidavit, there is no constitutional violation and Vanderpool's § 1983 claim against Lt. Smith must fail.
 
 
 64
 Finally, regardless of whether the affidavit was sufficient to support the probable cause necessary for the arrest warrant, Lt. Smith would have been entitled to qualified immunity. The same standard of "objective reasonableness" that applies in the Leon suppression hearing context similarly applies in cases where an officer's warrant request allegedly causes an unconstitutional arrest. Malley, 475 U.S. at 344-45, 106 S.Ct. at 1098. "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." Id. (citation omitted).
 
 
 65
 The facts and law presented to Lt. Smith demonstrate that he acted objectively reasonable in issuing the Affidavit of Probable Cause used to support Vanderpool's arrest warrant. The Affidavit detailed several facts giving rise to Lt. Smith's reasonable belief that Vanderpool had violated the law: Lt. Smith observed Vanderpool close the door of the gambling machine room on April 3, 1992; Lt. Smith subsequently discovered and seized the machines in that room; Vanderpool supervised customer use of those gaming machines; and Vanderpool paid the winnings from those machines to the customers. Without question, this evidence would lead a reasonable officer to believe that there was probable cause to arrest Vanderpool on gambling charges.C. Appellants' Sec. 1983 Claims Against the Richmond Police Department and Unnamed Police Officers[5]
 
 
 66
 We summarily affirm the district court's grant of summary judgment in favor of the Richmond Police Department on Appellants' § 1983 claims. In order to pursue a § 1983 claim against a municipality or local governmental department, such as a police department, plaintiffs must demonstrate that they have suffered a deprivation of their constitutional rights based on some official policy or custom of the municipality or department. See Monell v. Department of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978). In that regard, "a direct causal link" must exist between the "municipal policy or custom and the alleged constitutional deprivation." City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989). Nowhere in their brief do Forman, Dix, or Vanderpool assert any constitutional deprivation as a result of an official policy or custom of the Richmond Police Department. As such, we easily reject their appeal against the Richmond Police Department.
 
 
 67
 To the extent that Forman, Dix, or Vanderpool raised any claims on appeal against any unnamed officers of the Richmond Police Department ("John Does 1-50"), we find that those claims are time barred. Appellants failed to name the "John Does" within Indiana's two-year statute of limitations for personal injuries, which applies to § 1983 claims. See Perez v. Sifel, 57 F.3d 503, 505 (7th Cir.1995) ("[T]he two-year Indiana statute of limitations for personal injuries (Ind.Code § 34-1-2-2) applies to § 1983 claims.").
 
 
 68
 Regardless of the statute of limitations, these unnamed officers would be entitled to qualified immunity for their actions in the search of the Bingo Center, the seizure of the gambling machines, and the arrests of Forman, Dix, and Vanderpool. Their actions, presumably like those of Lt. Smith, similarly did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. As such, the district judge could properly grant summary judgment in favor of the unknown officers. See Hunger v. Leininger, 15 F.3d 664, 669 (7th Cir.) ("A district judge is authorized to grant summary judgment to a party that has not requested it ...."), cert. denied, 513 U.S. 839, 115 S.Ct. 123, 130 L.Ed.2d 67 (1994).
 
 
 69
 The summary judgment orders granted by the district court are hereby AFFIRMED.
 
 
 
 [1]
 Forman, Dix, and Vanderpool waived various claims put forth in their district court complaint and presented in the summary judgment motions-- i.e., their 42 U.S.C. § 1985 claims, as well as their state claims for false arrest, false imprisonment, and defamation--because they failed to argue those issues in their appellate brief. See United States v. Linnear, 40 F.3d 215, 222 (7th Cir.1994); Gabriel v. United States, 30 F.3d 75, 77 (7th Cir.1994); Rivera v. Benefit Trust Life Ins. Co., 921 F.2d 692, 697 (7th Cir.1991). To the extent that Appellants preserved any § 1983 claims against the Richmond Police Department as an individual entity or against any "unnamed officers" from that department as "John Does," those contentions are discussed below in section C
 We also note that Wayne County Prosecutor Terry O'Maley is not a party to this appeal despite the discussion of the claims against O'Maley in Appellants' brief. The district court dismissed the claims against O'Maley in an order dated October 6, 1995. The Notice of Appeal and the Docketing Statement that Appellants filed with this court address only the district court's April 1, 1996 summary judgment determination. Neither document challenges the district court's October 6, 1995 order dismissing O'Maley.
 Moreover, Appellants' counsel was aware of the confusion regarding O'Maley's status in the appeal. Upon receiving Appellants' brief, which did not include O'Maley as a named party, the Indiana Attorney General's office telephoned the clerk of this court in order to determine O'Maley's status. We informed the Indiana Attorney General's office that O'Maley was not a party to this appeal. In a letter dated July 26, 1996, the Indiana Attorney General's office informed Appellants' counsel that O'Maley was not a party to the appeal and that, accordingly, he would not file an appellate brief. Appellants' counsel made no further efforts to ensure that he properly appealed the district court's order dismissing the O'Maley claims. As such, we will not entertain Appellant's claims against O'Maley.
 
 
 [2]
 Although the en banc decision was handed down on June 30, 1992, almost three months after the search of the Bingo Center, the Fifth Circuit's inability to reach a consensus provides strong evidence that the Fourth Amendment caselaw regarding the scope of consent searches was not clearly established three months earlier on April 3, 1992
 
 
 [3]
 In passing, Forman argues that Ogletree's consent to search was somehow involuntary, and the fact that it took Ogletree only three minutes to sign the consent to search form demonstrates the presence of police coercion. This court, however, has held that the mere fact that a defendant was surrounded by a number of police officers or was placed in handcuffs does not render his consent to search involuntary. See United States v. Janik, 723 F.2d 537, 548 (7th Cir.1983). The scant evidence of coercion alleged here--i.e., the three minutes it took for Ogletree to sign the consent to search form--does not even approach the alleged evidence of coercion in Janik which we ultimately found to be constitutionally unobjectionable
 
 
 [4]
 Like the district court and Lt. Smith, we found it truly challenging to figure out exactly what Dix was attempting to claim in his brief. We note, however, that if Dix intended to assert any constitutional violations based on Lt. Smith's actions on April 3, 1992, he might be barred from bringing those claims. Because Dix was convicted based on his April 3, 1992 conduct, he could not recover damages pursuant to § 1983 if his claims "would necessarily undermine the validity of his conviction[s]." Simpson v. Rowan, 73 F.3d 134, 136 (7th Cir.1995), cert. denied, --- U.S. ----, 117 S.Ct. 104, 136 L.Ed.2d 58 (1996). In that case, Dix could bring his § 1983 claims only after proving that his convictions were "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Heck v. Humphrey, 512 U.S. 477, ----, 114 S.Ct. 2364, 2372, 129 L.Ed.2d 383 (1994)
 
 
 [5]
 In its brief, the Richmond Police Department asserts that Forman, Dix, and Vanderpool waived their § 1983 claims against the Richmond Police Department as an independent entity and against the fifty unnamed officers of that department ("John Does 1-50") because Appellants "fail[ed] to present or argue those issues" on appeal. In their brief, Appellants generally refer to the "actions of Smith and the officers of the Richmond Police Department" without further description of the Department as an "individual entity" or designation of the officers as "unnamed officers" or "John Does." Thus, we note that it is only out of an abundance of labored thoroughness that we discuss the merits of these two claims