Gwendolyn **BUCHANAN** and Georgia Hamberlin, Plaintiffs,

v.

**TOWER AUTOMOTIVE, INC., Tower Automotive Products Company, and A.O. Smith Corporation, Defendants.**

Nos. 97–C–925, 97–C–926, 97–C–1182 and 97–C–1192.

United States District Court, E.D. Wisconsin.

Jan. 8, 1999.

F. Thomas Olson, Hall Charne Burce & Olson, Milwaukee, WI, for Plaintiffs.

Shelly A. Ranus, Timothy G Costello, Krukowski & Costello, Milwaukee, WI, for Defendants.

### DECISION AND ORDER

CALLAHAN, United States Magistrate Judge.

#### Background

This is a race discrimination case. However, it did not begin as one case. Instead, it began as multiple cases which were ultimately, upon stipulation of the parties, consolidat-

ed into one case. The net result of the foregoing is that, as of February 20, 1998, the date upon which the order of consolidation was signed, there was pending before this court a complaint in which plaintiffs Georgia Hamberlin ("Hamberlin") and Gwendolyn Buchanan Mallory ("Buchanan") allege that they were discriminated against on the basis of their race when they were not interviewed and/or selected for the position of manpower clerk by the defendants. The relevant conduct giving rise to the allegations is alleged to have occurred in October and November 1994. At that time the plaintiffs were employees of defendant A.O. Smith Corporation ("A.O.Smith"). However, and as is found more particularly in the statement of facts set out below, in or about April 1997, defendant Tower Automotive Products Co. purchased from A.O. Smith certain assets of A.O. Smith Automotive Products Co., Inc., which was at that time a division of A.O. Smith. Tower Automotive Products Co. continued to utilize the assets of A.O. Smith Automotive Products Co., Inc. in the same manner and fashion that A.O. Smith had utilized those assets. Tower Automotive Products Co. also continued to employ substantially all of the employees that were formerly employed by A.O. Smith Automotive Products Co., Inc. Defense counsel has entered an appearance on behalf of all three defendants—Tower Automotive, Inc., Tower Automotive Products Co., Inc., and A.O. Smith Corporation. Furthermore, the defendants have collectively filed a motion for summary judgment seeking the dismissal of the plaintiffs' complaint. Consequently, for purposes of brevity, the defendants will be referred to throughout this Decision and Order collectively as "Tower".

To reiterate, the plaintiffs claim that they were discriminated against by Tower. They assert claims under Title VII, i.e., 42 U.S.C. § 2000e–2 and 42 U.S.C. § 1981. Since the filing of this action the parties have engaged in extensive discovery. Now, after the close of such discovery, Tower has filed a motion for summary judgment seeking dismissal of this action. Tower's motion has now been fully briefed by the parties and is ready for resolution. For the reasons which follow, Tower's motion for summary judgment is granted.

### Facts

Consistent with its obligation under Local Rule 6.05 (E.D.Wis.), Tower submitted proposed findings of fact in support of its motion for summary judgment. The plaintiffs responded to those proposed findings of fact and, consistent with Local Rule 6.05(b)(2), presented additional proposed factual propositions to which Tower has replied. The net result is that the following facts are undisputed for purposes of resolution of Tower's motion. Additional undisputed material facts, however, may be referenced throughout the body of this Decision and Order.

### 1. Defendants' Proposed Findings of Fact.

The U.S. District Court for the Eastern District of Wisconsin has jurisdiction to preside over this matter, or to otherwise decide if it has jurisdiction to so preside, pursuant to 42 U.S.C. §§ 2000e–5(f)(3) and 1981, and 18 U.S.C. § 1331. (Defendant's Proposed Findings of Fact ("DPFF") # 1).

The U.S. District Court for the Eastern District of Wisconsin is the proper federal venue for this civil action. (DPFF, # 2).

Plaintiff Hamberlin is an adult resident of the State of Wisconsin. (Deposition of Georgia Hamberlin ("Hamberlin Dep.") at 4) (DPFF # 3).

Plaintiff Buchanan is an adult resident of the State of Wisconsin. (Deposition of Gwendolyn Buchanan Mallory ("Buchanan Dep.") at 4) (DPFF # 4).

Defendant Tower Automotive, Inc. ("Tower Automotive") has its principal place of business located in Minneapolis, Minnesota. (DPFF # 5).

Defendant Tower Automotive Products Company, Inc. ("Tower Automotive Products") maintains its corporate headquarters and principal place of business in Milwaukee, Wisconsin, and operates as a division of Tower Automotive. Tower Automotive Products is engaged in the business of manufacturing and distributing automobile and truck frames. (Affidavit of Robert F. Trednic

("Trednic") ("Trednic Aff.") at ¶ 8) (DPFF # 6).

Defendant A.O. Smith has its corporate headquarters and principal place of business located in Milwaukee, Wisconsin. Prior to April 1997, A.O. Smith was engaged at its facilities on North 27th Street in Milwaukee, Wisconsin, in manufacturing and distributing automobile and truck frames. (Trednic Aff. at ¶ 7) (DPFF # 7).

In April 1997, Tower Automotive Products purchased from A.O. Smith certain assets of A.O. Smith Automotive Products Company, Inc. ("A.O. Smith Automotive"), which was at that time a division of A.O. Smith. (Deposition of Robert F. Trednic ("Trednic Dep.") at 4) (Trednic Aff. at ¶ 6) (DPFF # 8).

Tower Automotive Products continues to utilize the assets of A.O. Smith Automotive in the same manner and fashion that A.O. Smith had utilized those assets. Tower Automotive Products also continues to employ substantially all of the employees that were formerly employed by A.O. Smith Automotive. (Trednic Dep. at 4–5) (Trednic Aff. at ¶¶ 8–9) (DPFF # 9).

Tower Automotive Products presently manufactures and distributes automobile and truck frames at its facilities located on North 27th Street in Milwaukee, Wisconsin. (Trednic Aff. at ¶ 7) (DPFF # 10).

The hourly production employees at Tower Automotive Products are members of various unions and are subject to the provisions of various collective bargaining agreements. (Deposition of Trudy Fredenberg ("Fredenberg") ("Fredenberg Dep.") at 11–12) (DPFF # 11).

Hamberlin was hired by A.O. Smith on September 21, 1974. (Hamberlin Dep. at 6) (DPFF # 12).

Hamberlin worked a variety of hourly production jobs for A.O. Smith and continued her employment with Tower Automotive Products after April 1997. (Hamberlin Dep. at 64, 142–54, Ex. 6) (DPFF # 13).

While working as a production employee at A.O. Smith, Hamberlin joined the A.O. Smith Steelworkers Union, Local No. 19806 ("Steelworkers Union"). She was covered by the collective bargaining agreement between A.O. Smith and the Steelworkers Union. (Hamberlin Dep. at 15–16) (DPFF # 14).

Hamberlin continued to work as a production employee following Tower Automotive's purchase of the assets of A.O. Smith Automotive, a division of A.O. Smith. (Hamberlin Dep. at 142–45) (DPFF # 15).

Prior to obtaining employment at A.O. Smith, Hamberlin obtained an Associates Degree in Business Administration from Sawyer Business College in 1978. (Hamberlin Dep. at 5–6) (DPFF # 16).

Buchanan was hired by A.O. Smith as a production employee on April 21, 1976. (Buchanan Dep. at 13) (DPFF # 17).

While working as a production employee at A.O. Smith, Buchanan joined the Steelworkers Union. She was covered by the collective bargaining agreement negotiated between A.O. Smith and the Steelworkers Union. (Buchanan Dep. at 11) (DPFF # 18).

Buchanan continued to work as a production employee following Tower Automotive's purchase of the assets of A.O. Smith Automotive, a division of A.O. Smith. (Buchanan Dep. at 130) (DPFF # 19).

Buchanan obtained a Bachelor's Degree in Professional Communication in Business Management from Alverno College in 1987. (Buchanan Dep. at 6) (DPFF # 20).

Buchanan obtained a Master's Degree in Communications from Marquette University in 1993. (Buchanan Dep. at 10) (DPFF # 21).

In 1994, Clinton Day ("Day"), an African–American male, was employed by A.O. Smith as a manpower clerk in the Manpower Department. (Deposition of Clinton Day ("Day Dep.") at 14–15) (DPFF # 22).

In 1994, Fredenberg was employed by A.O. Smith as administrator in the Manpower Department. (Fredenberg Dep. at 15) (DPFF # 23).

In 1994, Trednic was employed by A.O. Smith as supervisor of the Manpower Department (Trednic Dep. at 5) (DPFF # 24).

In or about October 1994, Day advised Fredenberg that he intended to retire from

A.O. Smith at the end of December 1994. (Day Dep. at 17–18) (Fredenberg Dep. at 15) (DPFF # 25).

Shortly thereafter, Fredenberg advised Trednic that Day planned to retire at the end of December 1994, and that his manpower clerk position would be vacant. (Fredenberg Dep. at 15–16) (Trednic Dep. at 8) (DPFF # 26).

Fredenberg and Trednic felt that it was necessary to fill Day's manpower clerk position as soon as possible due to the critical nature of the job duties performed in that position. (Fredenberg Dep. at 16–17) (Trednic Dep. at 8, 16, 22–24) (DPFF # 27).

The individual chosen to fill the manpower clerk position vacated by Day would be responsible for processing requests submitted by production floor personnel for hourly workers. That would require an analysis of the terms of the applicable collective bargaining agreements to determine which employees were eligible for the available positions, whether through recall, transfer, bumping or hire, and which employees would be affected by such production moves. (Fredenberg Dep. at 7–15) (Trednic Dep. at 37–38) (DPFF # 28).

At the direction of Trednic, Fredenberg created a list of job-related qualifications for the manpower clerk position. (Fredenberg Dep. at 16–17) (Trednic Dep. at 12–13) (DPFF # 29).

Those job-related qualifications were then given to Georgia Polansky ("Polansky") to be incorporated into a "Position Opportunity Announcement." (Fredenberg Dep. at 17–18) (Trednic Dep. at 13–17) (DPFF # 30).

In 1994, Polansky was employed by A.O. Smith as a manager/recruiter in its Human Resources Department. (Deposition of Georgia Polansky ("Polansky Dep.") at 10) (Trednic Dep. at 14) (DPFF # 31).

At Trednic's direction, Polansky created a "Position Opportunity Announcement" for the available manpower clerk position which incorporated the job-related qualifications developed by Fredenberg and Trednic. (Fredenberg Dep. at 16–17) (Trednic Dep. at 13–18) (DPFF # 32).

A "Position Opportunity Announcement" was subsequently prepared and posted internally at A.O. Smith which advised employees of the available manpower clerk position in the Manpower Department. (Polansky Dep. at 23) (DPFF # 33).

The application deadline for the manpower clerk position was November 4, 1994. (Trednic Dep. at 22) (DPFF # 34).

Hamberlin submitted a resume for the available manpower clerk position in November 1994. (Buchanan Dep. at 12) (DPFF # 35).

Buchanan submitted a resume for the same manpower clerk position in November 1994. (Buchanan Dep. at 12) (DPFF # 36).

Dennis Wiebe ("Wiebe") submitted a resume for the same manpower clerk position in or about November 1994. (Polansky Dep. at 36) (DPFF # 37).

Richard Mashlan ("Mashlan") submitted a resume for the same manpower clerk position in or about November 1994. (Polansky Dep. at 36) (DPFF # 38).

Suzanne Eberhardt ("Eberhardt") submitted a resume for the same manpower clerk position in or about November 1994. (Polansky Dep. at 36) (DPFF # 39).

Wiebe, Mashlan and Eberhardt are Caucasian. (Buchanan Dep. at 114–15) (DPFF # 40).

Other minority and non-minority employees of A.O. Smith also applied for the available manpower clerk position in or about November 1994. (Buchanan Dep. at 114–17) (DPFF # 41).

Hamberlin took her resume directly to Polansky's office. (Hamberlin Dep. at 80–82) (DPFF # 42).

Polansky accepted Hamberlin's resume, but was very abrupt and would not discuss the manpower clerk position with Hamberlin. (Hamberlin Dep. at 80–82) (DPFF # 43).

Buchanan contacted Polansky by telephone from the A.O. Smith security office to ask if she could personally deliver her resume. (Buchanan Dep. at 74–75) (DPFF # 44).

Polansky denied Buchanan's request and told her to leave the resume at the security

office. (Buchanan Dep. at 75–76) (DPFF # 45).

Buchanan contacted Marge Giese ("Giese") and asked her to deliver her resume to Polansky. Giese agreed to do so. (Buchanan Dep. at 77) (DPFF # 46).

Polansky was directed by Trednic to identify the most qualified candidates for the manpower clerk position utilizing the job-related qualifications set forth in the "Position Opportunity Announcement." (Trednic Dep. at 23–27) (DPFF # 47).

Relying upon the job-related qualifications set forth in the "Position Opportunity Announcement," Polansky identified three candidates she believed were qualified for the manpower clerk position. (Polansky Dep. at 23, 62–64) (Trednic Dep. at 30–31) (DPFF # 48).

The candidates selected by Polansky were Wiebe, Mashlan and Eberhardt. They were then interviewed by Trednic and/or Fredenberg for the manpower clerk position. (Fredenberg Dep. at 31) (Trednic Dep. at 26–33) (DPFF # 49).

All three candidates were non-minority employees of A.O. Smith, although both minority and non-minority employees were rejected from the interview and/or selection process. (Buchanan Dep. at 114–17) (DPFF # 50).

Hamberlin and Buchanan were not selected by Polansky to be interviewed for the available manpower clerk position. (Hamberlin Dep. at 84) (Buchanan Dep. at 78) (DPFF # 51).

Wiebe and Mashlan subsequently withdrew their applications for the manpower clerk position after learning that the position was a non-union, at-will position that would pay them less and would provide them with lesser benefits than they were receiving at the time under the terms of their collective bargaining agreements. (Trednic Dep. at 28–33) (DPFF # 52).

Eberhardt was interviewed by Trednic and Fredenberg for the manpower clerk position. (Fredenberg Dep. at 33) (Trednic Dep. at 33) (DPFF # 53).

Trednic was the individual responsible for selecting the candidate that would fill the manpower clerk position. (Trednic Dep. at 35–36) (DPFF # 54).

Trednic selected Eberhardt to fill the manpower clerk position based upon her skills, work experience and satisfaction of the job-related qualifications established for the manpower clerk position. (Trednic Dep. at 37–38) (DPFF # 55).

Trednic did not interview any other candidates for the manpower clerk position because he felt that Wiebe, Mashlan and Eberhardt were all viable candidates for the job. (Trednic Dep. at 36–37) (DPFF # 56).

The job-related qualifications utilized by A.O. Smith in selecting a replacement for Day in the manpower clerk position were not race-based. (Buchanan Dep. at 117–18) (DPFF # 57).

Hamberlin did not satisfy all of the job-related qualifications for the manpower clerk position. (Hamberlin Dep. at 90–91) (DPFF # 58).

Buchanan did not satisfy all of the job-related qualifications for the manpower clerk position. (Hamberlin Dep. at 84–86; 112–16) (DPFF # 59).

Neither Hamberlin nor Buchanan has any direct knowledge of the qualifications of the candidates for the manpower clerk position that were not chosen for an interview and for the position. (DPFF # 60).

The manpower clerk position was a non-union, at-will position. (Trednic Aff. at ¶ 6) (DPFF # 61).

Hamberlin filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that A.O. Smith had acted in violation of Title VII by denying her a promotion, on the basis of her race, to the position of manpower clerk. (Hamberlin Dep. at 10) (DPFF # 62).

Buchanan filed a charge of discrimination with the EEOC also alleging that A.O. Smith had acted in violation of Title VII by denying her a promotion, on the basis of her race, to the position of manpower clerk. (Buchanan Dep. at 86) (DPFF # 63).

Hamberlin received two right to sue notices from the EEOC. One right to sue notice found "no probable cause" to believe that A.O. Smith had violated Title VII with regard to a failure to promote. (Hamberlin Dep. at 160) (DPFF # 64).

Buchanan received two right to sue notices from the EEOC. One right to sue notice found "no probable cause" to believe that A.O. Smith had violated Title VII with regard to a failure to promote. (Buchanan Dep. at 86). (DPFF # 65).

## 2. Plaintiffs' Additional Proposed Findings of Fact and Defendants' Replies Thereto.

As an employment manager, Polansky interviewed and hired for outside positions. (Polansky Dep. at 11) (Plaintiffs' Additional Proposed Findings of Fact ("PPFF") # 1).

Polansky solicited people who were not currently employed by A.O. Smith for positions within the company; the people would not be internal transfers. (Polansky Dep. at 11) (PPFF # 2).

As employment manager, Polansky did not have anything to do with union positions. (Polansky Dep. at 11) (PPFF # 3).

The manpower clerk position was not the typical position with which Polansky was concerned in her position as employment manager and, at the time of her deposition, Polansky could not recall why she was involved in the process by which the position was to be filled in 1994. (Polansky Dep. at 27–29, 39–40) (PPFF # 4).

Mashlan's resume did not reflect that he met the education requirements for the manpower clerk position. (Polansky Dep. at 36 and 39) (PPFF # 5). However, in her deposition, Polansky testified that she reviewed Human Resources' files to determine that Mashlan met the requisite educational requirements for the manpower clerk position. (Polansky Dep. at 39, 62–64) (Defendants' Response to Plaintiffs' Additional Proposed Findings of Fact ("DRPPFF") # 5).

Mashlan's resume does not refer to PDS, PAMS or Report Writer. (Polansky Dep. at 36) (PPFF # 6). However, in her deposition, Polansky testified that she could determine that Mashlan satisfied the PDS, PAMS and Report Writer qualifications for the manpower clerk position by virtue of the work experience and jobs listed on Mashlan's resume. (Polansky Dep. at 36–39, 62–64) (DRPPFF at 3, ¶ 6).

Eberhardt's resume does not reflect any education beyond high school. (Polansky Dep. at 36) (PPFF # 7). However, Polansky testified that she made determinations regarding educational requirements based either upon a review of an applicant's resume or upon a review of their Human Resources' file. Eberhardt testified that she was a high school graduate. (Eberhardt Dep. at 34) (DRPPFF # 7).

### Standards for Summary Judgment

Summary Judgment is no longer disfavored under the Federal Rules. See, *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole which are designed to 'secure the just, speedy and inexpensive determination of every action.'" It "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial times for those that really do raise genuine issues of material fact." *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.*, 794 F.Supp. 328, 330 (E.D.Mo.1992)).

Rule 56(c), Fed.R.Civ.P., requires a district court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." The mere existence of some factual dispute does not defeat a summary judgment motion: the requirement is that there by a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it

must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

The party moving for summary judgment bears the initial burden of showing that there are no material facts in dispute, and that judgment should be entered in his favor. *Hannon v. Turnage,* 892 F.2d 653, 656 (7th Cir.), *cert. denied,* 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990). A party moving for summary judgment may satisfy this initial burden by pointing to the adverse party's failure to introduce sufficient evidence to support each essential element of the cause of action alleged. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548.

A party opposing a properly supported summary judgment motion "may not rest upon mere allegations or denials" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Fed. R .Civ.P. **See also,** *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548 and *Becker v. Tenenbaum–Hill Associates, Inc.,* 914 F.2d 107, 110 (7th Cir.1990). "If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Rule 56(e), Fed.R.Civ.P. And a party to a lawsuit may not ". . . ward off summary judgment with an affidavit or deposition based on rumor or conjecture. 'Supporting and opposing affidavits shall be made on personal knowledge, . . .' " *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572–73 (7th Cir.1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Griffin v. City of Milwaukee,* 74 F.3d 824, 826–27 (7th Cir.1996); *Johnson v. Pelker,* 891 F.2d 136, 138 (7th Cir.1989). "However, we are not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). Moreover, neither "the mere existence of **some** alleged factual dispute between the parties," *Anderson,* 477 U.S. at 247, 106 S.Ct.

2505, nor the demonstration of "some metaphysical doubt as to the material facts," *Matsushita Electric,* 475 U.S. at 586, 106 S.Ct. 1348, will sufficiently demonstrate a genuine issue of material fact. In that regard, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. **See also,** *Forman v. Richmond Police Department,* 104 F.3d 950 (7th Cir. 1997).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

### Analysis

Tower bases its motion for summary judgment on several grounds. First, it argues that this court lacks subject matter jurisdiction over the plaintiffs' Title VII claims. Second, Tower claims that the plaintiffs have failed to prove a prima facie case of race discrimination in violation of Title VII. In the alternative, Tower argues that the plaintiffs, in any event, have failed to prove pretext. Finally, Tower argues that the plaintiffs' claim under 42 U .S.C. § 1981 should be dismissed because: (1) they have failed to prove a contractual relationship between them and Tower; and, (2) in any event, they have failed to prove either a prima facie case of discrimination or pretext.

### 1. The Question of Subject Matter Jurisdiction.

Before even getting to the plaintiffs' substantive claims, Tower argues that this court lacks subject matter jurisdiction over the plaintiffs' Title VII claim. It does so on two grounds. First, Tower argues that more than 90 days elapsed after the plaintiffs received their right to sue letter on their EEOC charge of discrimination stemming from Tower's failure "to promote" them to the manpower clerk position. Second, even though this action was filed within 90 days of

the plaintiffs' receipt of the right to sue letter on their EEOC charge of discrimination stemming from Tower's failure "to interview" them for the manpower clerk position, this action should nevertheless be dismissed because there is "no ... cause of action under Title VII for failure to interview when an individual is not selected for a position." (Defendants' Brief, p. 16).

There are several prerequisites to successfully maintaining a discrimination claim under the provisions of Title VII. First, a plaintiff must file a charge of discrimination with the EEOC within 300 days of the allegedly unlawful conduct. 42 U.S.C. § 2000e–5(e)(1). Second, the EEOC must issue a "right to sue" notice. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *EEOC v. Harris Chernin, Inc.*, 10 F.3d 1286, 1288, n. 3 (7th Cir.1993); *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir.1992). Finally, a plaintiff must file a complaint in federal court within the time period allotted by statute. Title VII provides, in pertinent part, as follows:

> If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or if within 120 days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d) of this section, whichever is later, the Commissioner has not filed a civil action under this section ... or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commissioner shall notify the person aggrieved and within 90 days after the giving of such notice a civil action may be brought against the respondent named in the charge....

42 U.S.C. § 2000e–5(f)(1).

■ Absent special circumstances which give rise to waiver, estoppel, or equitable tolling of the 90 day period, a Title VII claim is time barred when the action in which such claim is asserted has been filed more than 90 days after receipt of the right to sue notice. *Anooya v. Hilton Hotels Corp.*, 733 F.2d 48, 49 (7th Cir.1984). The Seventh Circuit Court of Appeals has noted that the 90 day filing provision reflects "a policy that there should be no delay in employment discrimination cases. It is a recognition that memories may fail in the workplace in recalling the minutia of what was said and what was done.... It therefore becomes necessary to hear testimony while precise recollections are keen and not dulled by undue passage of time." *Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 775 (7th Cir.1995).

To reiterate, the plaintiffs each filed two charges with the EEOC. Their first charge was that Tower (more properly its predecessor, A.O. Smith) had acted in violation of Title VII by denying them each a promotion, on the basis of race, to the position of manpower clerk. On that charge, the EEOC issued right to sue notices on March 18, 1997.

The plaintiffs, however, filed a second charge with the EEOC. In this second charge, they claimed that Tower had acted in violation of Title VII by failing to grant them an interview for the manpower clerk position. As to this second charge, the EEOC issued both of the plaintiffs a second right to sue notice, dated June 4, 1997.

On August 29, 1997, the plaintiffs filed their complaints in this court, alleging violations of Title VII. In those complaints the plaintiffs do not merely allege that Tower acted in violation of Title VII by failing to promote them for the available manpower clerk position. Instead, they each claim that Tower's "failure to interview" them for the manpower clerk position constituted a violation of Title VII. (Plaintiffs' Complaint, ¶ 9).

Because August 29, 1997, was more than 90 days after March 18, 1997, i.e., the issuance date of the first right to sue notice, Tower argues that the plaintiffs cannot proceed on their failure to promote claim. And, because a failure to interview cannot constitute a basis for Title VII liability, the fact that the plaintiffs' actions were filed within 90 days of June 4, 1997, i.e., the date of issuance of the second right to sue notice, does not save their complaint. This is precisely because there is no relief afforded under Title VII for failure to interview. On

this point, Tower cites the Seventh Circuit's decision in *Lee v. National Can Corp.*, 699 F.2d 932 (7th Cir.1983).

■ The plaintiffs implicitly acknowledge that their complaints were filed more than 90 days after they received from the EEOC the first notice of right to sue letters regarding their "failure to promote" EEOC charges. However, they argue that there is a cause of action under Title VII for failure to interview and that, therefore, their complaints seeking relief from Tower's failure to interview them for the manpower clerk position were timely filed and, thus, this court has jurisdiction over such claims. In support of their position, the plaintiffs rely on the provisions of 42 U.S.C. § 2000e–2(a)(2), as well as *Taylor v. USAir, Inc.*, 56 FEP Cases 357, 1991 WL 496665 (W.D.Pa.Apr.25, 1991); *Williams v. Pharmacia Opthalmics, Inc.*, 926 F.Supp. 791 (N.D.Ind.1996); and, Senior District Judge Myron L. Gordon's Decision and Order of August 11, 1998, in the case of *David Drews v. Social Development Commission*, Case No. 97–C–1071 (E.D.Wis.1998).

In *Lee*, **supra**, upon which Tower places virtually exclusive reliance for its argument, the plaintiff had alleged race discrimination arising out of his twice applying for a machinist job with the defendant. The first time he applied was on May 10, 1977. On that same day, he was interviewed by two individuals. No decision was made with respect to his application on May 10, 1977. According to one of the defendant's witnesses at trial, Lee's application was considered "pending" on that date. Indeed, the plaintiff admitted that no one had told him on May 10, 1977, that he would not be hired.

Nevertheless, on the following day, May 11, 1977, Lee filed an EEOC charge against the defendant alleging that the "shop foreman" had interviewed Caucasian applicants during the time that Lee was waiting to see one of the people who was supposed to interview him.

The second time Lee applied was on June 7, 1977. He was also interviewed on that date. At the time of Lee's interview, the interviewer noticed disparities between the two written applications that Lee had submitted to National Can, the first being on May 10, the second being on June 7. Pursuant to company policy expressed in the employee handbook, as well as on the application for employment, the interviewer told Lee that he would not be hired because of the false information on one, or both, of the applications.

The district court, after a bench trial, entered judgment for the plaintiff. The Seventh Circuit reversed. First and foremost, the Seventh Circuit found that Lee had not proven that his not being hired was as a result of race discrimination. Instead, it found that Lee was not qualified for the position and that, therefore, he had failed to establish a prima facie case of race discrimination. Furthermore, the Seventh Court found that Lee had failed to prove pretext when confronted with the reason advanced by the defendant for its not hiring Lee, i.e., that he had falsified at least one of the applications.

At the conclusion of its opinion, the Seventh Circuit observed that the district court had skirted the pretext issue by its finding that Lee was a victim of discrimination on May 10, 1977—the day he first made application for employment with the defendant. In this regard, the Seventh Circuit offered that:

> The district court finding that Title VII was violated on May 10, 1977, however, is clearly erroneous. Glynn [the interviewer] testified that Lee's application was considered pending on that date, while Lee testified that he was not told he would not be hired until June 7. Furthermore, Tuczak's [another interviewer] failure to interview Lee on May 10 is not the type of conduct prohibited by Title VII.

*Lee*, 699 F.2d at 937–38.

It is the last quoted sentence, above, upon which Tower rests its argument in the instant action. And viewed in a vacuum, the quoted sentence would seem to support Tower's argument. But I am not persuaded that the afore-quoted language in *Lee* stands for the proposition that, under all circumstances, a failure to interview cannot be advanced as a violation of Title VII.

To begin with, the plaintiff's claim in *Lee* was that he was not hired because of racial discrimination, in violation of Title VII. As noted by the Seventh Circuit in *Lee*:

> Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000–e–2 makes it an unlawful employment practice for an employer to "fail or refuse to hire ... any individual ... because of such individual's race ..."

*Lee*, 699 F.2d at 935.

Obviously, it was in that context that the Seventh Circuit was reviewing the district court's decision. Nowhere in its decision did the Seventh Circuit make reference to that subsection of 42 U.S.C. § 2000e–2 which makes it a violation of Title VII for a defendant/employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee—because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §̀ 2000e–2(a)(2). In my opinion, a failure to interview an applicant because of his or her race can, under appropriate circumstances, constitute a violation of Title VII precisely because such action would constitute a limitation, segregation or classification of applicants for employment such as would deprive, or at least tend to deprive, those applicants of employment opportunities.

This was the holding in *Taylor*. In *Taylor*, the plaintiff, a Black male who had met the minimum qualifications as an airline pilot claimed that he was discriminated against because he was never called for an interview, while during the years that his application lay dormant, the defendant continued to interview Caucasian applicants, many of whom were less qualified than he. The district court observed that Title VII does more than just prohibit the failure to hire an individual on account of race or color; it provides additional protection to applicants for employment, including classifying job applicants on the basis of race if to do so would tend to deprive him or her of employment opportunities. *Taylor*, 56 FEP Cases at 363, 1991 WL 496665.

Indeed, in *Drews*, Case No. 97–C–1071, Judge Gordon allowed the plaintiff's Title VII race discrimination claims to go to the jury. The jury found that the defendant did discriminate against Drews based on his race when it failed to grant him an interview for a particular position, and gave the job to someone else. Based on the jury's finding that the plaintiff had been discriminated against by not having been granted an interview, Judge Gordon awarded the plaintiff some back pay, using the "loss of a chance" doctrine to calculate the appropriate amount thereof. In arriving at the appropriate amount, Judge Gordon acknowledged that the jury's decision did not constitute an affirmative finding that the defendant would have given Drews the particular employment position if there had been no discrimination against him in the interview process. Nevertheless, Drews was still entitled to equitable relief in the form of back pay based on his not even having been given an opportunity to interview. **See,** *Doll v. Brown*, 75 F.3d 1200, 1205–07 (7th Cir.1996).

In its reply brief in the instant action, Tower argues that a "Title VII discrimination claim based upon a 'failure to interview' would, at least theoretically, be viable **only** when there is no ultimate hiring decision." (Defendants' Reply Brief ("Reply Brief"), p. 6 (emphasis provided)). It proceeds to argue:

> For example, let us assume that an employer received applications from five (5) African–Americans for an open position and decided, solely on the basis of their race, not to hire any of these candidates. Let us also assume that this imaginary employer chose not to fill the position at all as a means of masking his discriminatory conduct (i.e., "I won't hire anyone for the job to avoid having to hire an African–American."). Since no individual, Caucasian or African–American was actually hired, the single (or ultimate) act of discrimination in this example would be the failure of the employer to interview some or all of the five (5) applicants because of their race. This example would be the type of limiting or segregating conduct that deprives an individual or employment

opportunities in violation of Title VII (*see* 42 U.S.C. § 2000e(2)(a)(2)).

(Reply Brief, pp. 6–7).

To be sure, the example presented by Tower is one that would invoke the provisions of § 2000e–2(a)(2). However, I do not view the language of that subsection to be as restrictive as the defendant views it to be. To the contrary, § 2000e–2(a)(2) clearly and unambiguously states that it is an unlawful employment practice for an employer "to limit, segregate, or classify his ... applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities ... because of such individual's race ..." In my view, depriving a person of an opportunity to interview for a job because of his or her race is precisely the kind of limitation, segregation or classification of applicants at which § 2000e–2(a)(2) is directed.

Of course, if it were demonstrated that, regardless of whether or not a person was deprived of an interview because of his or her race, the person was not qualified for the job, the defendant might **ultimately** be let off the hook precisely because the unlawful limitation, segregation or classification would have not had the effect of depriving or tending to deprive that individual of the particular employment opportunity. But that is not the precise issue the defendants have presented me with. Instead, the defendants argue that "separate causes of action under Title VII do not exist for failure to interview and failure to promote ... If an employer refuses to interview an individual (for initial hire or promotion), the individual, obviously, will not be hired or promoted. The failure to actually hire or promote would be the alleged unlawful employment practice, and the failure to interview is only a possible piece of evidence that a plaintiff may cite to the court or jury of a defendant's alleged pretextual motive." (Defendants' Brief, p. 14). In other words, the failure to interview and failure to promote merge into one discriminatory act and because the plaintiffs did not file this action within 90 days of receiving their right to sue notices on their "failure to promote" EEOC charge, this court has no jurisdiction over their claim.

In my view, in order for me to decide the discrete jurisdictional issue presented by the defendants' motion, however, it is not necessary for me to decide whether the defendants' merger theory is correct. Instead, it is enough to simply say that a cause of action exists under Title VII for failure to interview an applicant for a job if that failure to interview would deprive or tend to deprive that applicant of an employment opportunity and was the result of limiting, segregating or classifying applicants on the basis of their race. That is what the plaintiffs here, at least in part, argue was done to them. And the complaint in which they make such allegation was filed within 90 days of their having received the notice of right to sue letters from the EEOC on their "failure to interview" charge before that agency. Such being the case, the defendants' motion for summary judgment dismissing the plaintiffs' complaint because of lack of subject matter jurisdiction over the Title VII claim is denied.

## 2. The Issues of Prima Facie Case and Pretext.

That the plaintiffs may be entitled to proceed in this court on their Title VII failure to interview claim, however, does not necessarily mean that they can avoid the full brunt of Tower's motion for summary judgment. In order to do so, they must still demonstrate, through affidavits or other properly admissible evidence, that there is a genuine issue for trial. That is to say, the plaintiffs must demonstrate that a reasonable jury could return a verdict for them, on whom the burden of proof rests. **See,** *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 and *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

As stated previously, the plaintiffs' claims are based on alleged violations of Title VII and § 1981. Because the Seventh Circuit has analyzed both § 1981 and Title VII discrimination claims in the same manner, **see** *Eiland v. Trinity Hospital,* 150 F.3d 747, 750 (7th Cir.1998), I will review both of the plaintiffs' racial discrimination claims together.

Under § 1981, "[a]ll persons within the jurisdiction of the United States shall have

the same right ... to the full and equal benefit of all laws ... as enjoyed by white citizens." 42 U.S.C. § 1981. Under Title VII, it is unlawful for an employer "to limit, segregate, or classify ... applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities ... because of such individual's race ..." 42 U.S.C. § 2000e–2(a)(2).

When racial discrimination is based on a claim of disparate treatment, "[p]roof of intentional discrimination is required." *Gonzalez v. Ingersoll Milling Machine Co.,* 133 F.3d 1025, 1031 (7th Cir.1998). An employee may demonstrate his or her employer's intentional discrimination by providing either direct or indirect evidence. Direct evidence is evidence which, " 'if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption.' " *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 347 (7th Cir.1997) (quoting *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 569 (7th Cir.1989)).

Here the plaintiffs do not proceed under the direct evidence method of proof. Instead, they proceed under the indirect method of proof. The indirect method requires that the plaintiffs apply the burden-shifting method outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Initially the burden is on the plaintiffs to establish a prima facie case of discrimination. To establish a prima facie case of discrimination in a case such as this, where they claim they were denied an interview, the plaintiffs must show: (1) that the plaintiffs belong to a protected group; (2) that the plaintiffs applied for the manpower clerk position; (3) that neither of the plaintiffs was granted an interview; and, (4) that the defendant interviewed persons who had similar or lesser qualifications, i.e., that the employer treated similarly situated employees outside the protected group more favorably. *Taylor v. Canteen Corp.,* 69 F.3d 773, 779 (7th Cir.1995); *Bragg v. Navistar International Transportation Corp.,* 164 F.3d 373, 376–77, 1998 WL 901536 (7th Cir.1998). If the plaintiffs establish all of the elements of a prima facie case, the plaintiffs raise an inference of discrimina-

tion. **See,** *Lenoir v. Roll Coater, Inc.,* 13 F.3d 1130, 1132 (7th Cir.1994).

Once the plaintiffs establish a prima facie case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for the challenged employment decision. Finally, if the defendant produces a legitimate, nondiscriminatory reason for its employment decision, the burden shifts back to the plaintiffs to show that the legitimate, nondiscriminatory reason was pretextual. **See,** *Kirk v. Federal Property Management Corp.,* 22 F.3d 135, 138 (7th Cir.1994). The plaintiffs may prove pretext directly by showing that "a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason [for not being given an interview] is unworthy of credence." *Billups v. Methodist Hospital of Chicago,* 922 F.2d 1300, 1303 (7th Cir.1991) (citing, *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *Adusumilli v. City of Chicago,* 164 F.3d 353, 363–64, 1998 WL 901533 (7th Cir.1998).

▌ In other words, the employee (or in this case the applicant for an interview) has the burden of showing that the employer's reason for the adverse job action was a lie or had no basis in fact. *Crim v. Board of Education of Cairo School District No. 1,* 147 F.3d 535, 541 (7th Cir.1998). It is not sufficient to prove that the reason was doubtful or mistaken. *Id.* It must be shown to be a phony reason for some action. And even if the defendant's reason for not granting the plaintiffs an interview was mistaken, ill considered or foolish, if the defendant honestly believed in the reason then pretext has not been proven. *Id.,* **see also,** *Brill v. Lante Corp.,* 119 F.3d 1266, 1270 (7th Cir.1997). The question to be asked is not whether the reason for the employment action was "a correct business judgment but whether the decision makers honestly acted on that reason." *Bahl v. Royal Indemnity Co.,* 115 F.3d 1283, 1291 (7th Cir.1997). Thus, I am not to review the propriety of Tower's business decision not to afford the plaintiffs an interview for the manpower clerk position; I am only to consider whether the plaintiffs have proven that the reasons for that deci-

sion were pretextual because Tower (or more properly those Tower employees making such decision) did not honestly believe them. *Crim,* 147 F.3d at 541.

Finally, it must be emphasized that in their effort to prove pretext the plaintiffs must produce more than their subjective belief of their own qualifications and their disagreement with Tower's business decision. If that is all that is produced then the plaintiffs have not raised a material dispute about Tower's honesty in its asserted reason for the decision. *Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 481 (7th Cir.1995); *Ost v. West Suburban Travelers Limousine, Inc.,* 88 F.3d 435, 441 (7th Cir. 1996) ("[P]laintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reason for the employment actions.")

The Seventh Circuit has noted that employers may act for many reasons, good and bad; they may err in evaluating employee's strengths; unless they act for forbidden reasons, these errors (more properly, differences in assessment) do not matter. *Kuhn v. Ball State University,* 78 F.3d 330, 332 (7th Cir.1996). Consequently, unless the defendant acts for a forbidden reason, "no matter how medieval a firm's practice is, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, Title VII ... does not interfere." *Sample v. Aldi, Inc.,* 61 F.3d 544, 551 (7th Cir.1995).

And, to reiterate, that the plaintiffs seek relief under 42 U.S.C. § 1981 as well as under Title VII does not render the above analysis inapplicable. To the contrary, the Supreme Court made clear in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), that the same principles of proof and allocation of burden of proof are applicable to race discrimination claims brought under both Title VII and 42 U.S.C. § 1981. In *Patterson,* the court stated:

> ... In order to prevail under § 1981, the plaintiff must prove purposeful discrimination ... We have developed, in analogous areas of civil rights law, a carefully designed framework of proof to determine, in

the context of disparate treatment, the ultimate issue whether the defendant intentionally discriminated against the plaintiff ... We agree with the Court of Appeals that this scheme of proof, structured as a "sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination," ... should apply to claims of racial discrimination under § 1981.

*Patterson,* 491 U.S. at 186, 109 S.Ct. at 2377–78.

Bearing these standards in mind, I will now turn to examining the question of whether the plaintiffs have produced sufficient evidence to successfully thwart Tower's motion for summary judgment.

■ To begin with, the plaintiffs maintain that they have proven a prima facie case of discriminatory failure to interview. Tower maintains that they have not. However, I choose to avoid the need to decide that issue and go directly to the issue of pretext. This is not inappropriate. See, *EEOC v. Our Lady of the Resurrection Medical Center,* 77 F.3d 145, 149–50 (7th Cir.1996) (Advancing to dispositive issue of pretext without deciding if plaintiff established prima facie case and collecting cases). "When the defendant has proffered an explanation for [an adverse job action] that the court determines to be nonpretextual, the court may avoid deciding whether the plaintiff has met his prima facie case and instead decide to dismiss the claim because there is no showing of pretext." *Abioye v. Sundstrand Corp.,* 164 F.3d 364, 368–69, 1998 WL 901534 (7th Cir.1998).

■ Even assuming the plaintiffs had adequately made out a prima facie case of race discrimination in not being afforded an interview for the manpower clerk position, they must nevertheless present evidence that Tower's proffered reason for their not being granted an interview—that there were candidates better qualified than either plaintiff for the position of manpower clerk (See, Defendants' Brief in Support of Motion for Summary Judgment, p. 25)—is pretextual in order to succeed on their claims. They must present evidence from which a finder of fact could reasonably infer pretext, i.e., that the

decision makers did not really believe that reason; that it is a lie. *Essex v. United Parcel Service, Inc.*, 111 F.3d 1304 (7th Cir. 1997).

It is important to state that I will be focusing on the evidence surrounding why the plaintiffs were not granted an interview and **not** why they were not selected for the position of manpower clerk. The distinction is important because there were three individuals who were involved in the process of hiring the manpower clerk. These three individuals are Polansky, Fredenberg and Trednic. As stated previously, in 1994 Polansky was employed by Tower as a management/recruiter in its Human Resources Department; Fredenberg was employed as an administrator in the Manpower Department; and, Trednic was employed as supervisor of the Manpower Department. But, it was only Polansky who selected those who were to be interviewed.

In or about October 1994, Day (an African–American male), who was at that time a manpower clerk in the Manpower Department, advised Fredenberg that he intended to retire from Tower at the end of December 1994. Shortly thereafter, Fredenberg advised Trednic that Day planned to retire at the end of December 1994, and that his manpower clerk position would be vacant. Fredenberg and Trednic believed that it was necessary to fill Day's manpower clerk position as soon as possible due to the critical nature of the job duties performed in that position.

At the direction of Trednic, Fredenberg created a list of job-related qualifications for the manpower clerk position. Those job-related qualifications were then given to Polansky to be incorporated into a "Position Opportunity Announcement." At Trednic's direction, Polansky created a "Position Opportunity Announcement" for the available manpower clerk position which incorporated the job-related qualifications developed by Fredenberg and Trednic. That "Position Opportunity Announcement" was posted internally at Tower (i.e., A.O.Smith) and it advised employees of the available manpower clerk position in the Manpower Department.

The application deadline for the manpower clerk position was November 4, 1994.

Polansky was directed by Trednic to identify the most qualified candidates for the manpower clerk position, utilizing the job-related qualifications set forth in the "Position Opportunity Announcement." Relying upon the job-related qualifications set forth in the "Position Opportunity Announcement," Polansky identified three candidates that she believed were qualified for the manpower clerk position. These three candidates were Wiebe, a Caucasian male; Mashlan, a Caucasian male; and, Eberhardt, a Caucasian female. In addition to these three individuals and the plaintiffs, there were other minority and non-minority employees of Tower who applied for the manpower clerk position and who were not granted interviews.

Wiebe and Mashlan subsequently withdrew their applications for the manpower clerk position after learning that the position was a non-union, at-will position that would pay them less and would provide them with lesser benefits than they were receiving at that time under the terms of their collective bargaining agreements. This left Eberhardt as the only person who had been interviewed by Trednic and/or Fredenberg who still wanted the job. And it was Trednic who was the individual responsible for selecting the candidate who would fill the manpower clerk position. Trednic selected Eberhardt based on her skills, work experience, satisfaction of the job-related qualifications established for the manpower clerk position and how she performed in the interview. Trednic did not interview any other candidates for the position because he felt that Wiebe, Mashlan and Eberhardt were all viable candidates for the job.

The plaintiffs agree that the job-related qualifications utilized by Tower in selecting a replacement for Day in the manpower clerk position were not race-based. Similarly, in their deposition testimony, neither plaintiff testified that, even in their opinion, race motivated Trednic or Fredenberg in the selection process. The heart of the plaintiffs' claim is that it was Polansky's decision to not include them in the group of candidates to be granted an interview that was, at least par-

tially, race based. And so it is the reasons advanced by Polansky for not including the plaintiffs in that group, and the plaintiffs' evidence that such reasons are a mere pretext, that must be examined in deciding whether Tower's motion for summary judgment should be granted.

When questioned at her deposition about her rationale for selecting certain candidates to be interviewed, Polansky testified that in order to decide if someone should be interviewed for the manpower clerk position she first determined whether they met the qualifications listed in the "Position Opportunity Announcement." Thereafter, Polansky selected those whom she believed were the most qualified for the position. Specifically, she testified:

Q: Okay. So is it fair to say that people who were interviewed were the most qualified in your mind based on the qualifications set forth in Exhibit 1 [the "Position Opportunity Announcement"]?

A: That's correct.

Q: And the people that were not interviewed were not the most qualified based on your application of the qualifications in Exhibit 1?

A: That's correct.

(Polansky Dep., at pp. 62–64).

To reiterate, in order to prove pretext, the plaintiffs must produce admissible evidence from which a reasonable jury could find that Polansky is lying when she states that she recommended for an interview those candidates whom she felt, in her mind, to be the most qualified. In an effort to do so, the plaintiffs have advanced several arguments. First, they argue that they were each as "objectively qualified" as any of the three selected and, indeed, were more objectively qualified than Mashlan.

But this argument misses the mark. Even assuming, arguendo, that the plaintiffs are correct in their view that they were as qualified as those who were interviewed (or more qualified than one interviewee), such "evidence" does not go to the question of Polansky's belief that, in her mind, the three candidates that she had selected were the most

qualified. **See,** *Eiland,* 150 F.3d at 753 (" '[W]hen we consider whether an employer's justification for dismissing its employee is pretextual, the inquiry is not whether the reason for the firing was a correct business judgment but whether the decision makers honestly acted on that reason.' " **citing,** *Bahl,* 115 F.3d at 1291).

Instead, such argument is little more than the plaintiffs' respective opinions that they were as qualified and, therefore, should have been granted an interview. And, it is well-settled that a plaintiff's subjective belief of her own qualifications does not raise a material dispute about the employer's honesty in its asserted reason for a decision. See, *Johnson,* 70 F.3d at 481 and *Ost,* 88 F.3d at 441.

Additionally, in their respective depositions (but not in their brief) the plaintiffs make reference to Polansky's alleged unwillingness to talk directly with them and/or directly accept their resumes. Specifically, Hamberlin presented in her deposition that she took her resume directly to Polansky's office. Polansky accepted Hamberlin's resume, but was very abrupt and would not discuss the manpower clerk position with her. Similarly, in her deposition, Buchanan presented that she contacted Polansky by telephone from the A.O. Smith security office to ask if she could personally deliver her resume. Polansky denied Buchanan's request and told her to leave the resume at the security office.

In explaining her conduct, however, Polansky testified that she would try to avoid accepting resumes directly from candidates or to otherwise talk with candidates prior to the interview process so that no one would think that a particular candidate was getting special consideration or a head start in the process. Notably, once again the plaintiffs have offered no evidence to call into question Polansky's veracity on this point.

Perhaps most significantly, one of the plaintiffs, Buchanan, acknowledged during her deposition that she was aware that Tower had considered and rejected non-minority candidates for the position of manpower clerk in November 1994. In other words, it was not just minority candidates who were

not granted interviews. There were also non-minority candidates who were not granted interviews.

In the end, the plaintiffs have been unable to offer any evidence to challenge Polansky's veracity when she asserts that, in her mind, she selected the most qualified candidates for interviews. At best, the plaintiffs present their view that they were at least as qualified, if not more qualified, than those candidates who were selected. But that is not enough to avoid summary judgment. In order to avoid summary judgment the plaintiffs must show pretext and this they have failed to show. Perhaps best illustrating the plaintiffs' inability to produce evidence of pretext is the following exchange that occurred during Buchanan's deposition:

Q: You have a reason to believe that A.O. Smith used race in determining whether you should be interviewed for the manpower clerk position right?

A: Yes.

Q: What facts do you base that belief on?

A: It's more on assumption than facts. I understand that out of—I believe it was six candidates who were minority by race, and out of the six, not one single one was qualified for an interview. Not one?

Q: Okay.

(Buchanan Dep., p. 118).

Assumptions are not facts. And it is only based on properly admissible evidence (in other words, facts), that a case such as this can proceed to trial. Because the plaintiffs have not presented admissible evidence sufficient to support a reasonable jury's finding that Polansky's expressed reason for not granting the plaintiffs an interview is phony, a sham, a lie, or pretextual, the defendants' motion for summary judgment must be granted and the plaintiffs' action must be dismissed.[1]

1. Tower argues that because the employment position for which the plaintiffs had applied was an at-will position, their not obtaining such position cannot support a § 1981 claim. This is because, according to Tower, "[i]n order to bring a Section 1981 claim there must be a contract". *Gonzalez v. Ingersoll Milling Machine Co.*, 133 F.3d 1025, 1034 (7th Cir.1998). And, not only

**NOW, THEREFORE, IT IS ORDERED** that the defendants' motion for summary judgment is **GRANTED;**

**IT IS FURTHER ORDERED** that judgment be entered **DISMISSING** this action, **WITH PREJUDICE.**

was the manpower clerk position an at-will position, but there was no contract between the parties under the terms of which the plaintiffs were entitled to either be interviewed or selected for that position. In light of my ruling on the question of pretext, however, there is no need for me to address Tower's argument on this point.